# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| **Pleasant Food, Inc. dba Sidelines Grill Pleasant View, C & G, Inc. dba Sidelines Grill Ashland City, Plantation Pub, Inc., Annex Road Group, Inc. dba Hillwood Pub, DTAG, Inc. dba Crow's Nest, JDA Pub, Inc. dba Joe's Place, on behalf themselves and all others similarly situated,** | Civil Action No. _____ <br><br> **CLASS ACTION COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** <br><br> **1. BREACH OF CONTRACT,** <br> **2. BREACH OF COVENANT OF GOOD FAIR AND FAIR DEALING,** <br> **3. DECLARATORY RELIEF** |
|        **Plaintiffs,** | |
| v. | |
| **Erie Insurance Exchange,** | |
|        **Defendant.** | |

Plaintiffs Pleasant Food, Inc. dba Sidelines Grill Pleasant View, C & G, Inc. dba Sidelines Grill Ashland City, Plantation Pub, Inc., Annex Road Group, Inc. dba Hillwood Pub, DTAG, Inc. dba Crow's Nest, JDA Pub, Inc. dba Joe's Place, (collectively "Plaintiffs" or "the Restaurants") file this Complaint against Erie Insurance Exchange, ("Erie" or "Defendant"), on behalf of themselves and all others similarly situated, and allege as follows:

## I.    INTRODUCTION

1.    Plaintiffs are six local restaurants and bars in the Nashville area. Several, like Sidelines Grill, are family owned and host live music. Others, like Hillwood Pub and Plantation Pub, are more nightlife oriented but also serve "pub style" food popular in local communities. Indeed, in 2014, Hillwood Pub participated in and won the "Music City Hot Wings Festival."

2.    In or around March 2020, Plaintiffs were forced to shut down. This closure was ordered by the state and local governments who required the Restaurants, their workers, and their

2001514.2

customers to "shelter in place" and abide by strict "social distancing" guidelines. These compulsory shutdowns forced the Restaurants to lay off employees and forgo income for several months while continuing to pay many regular expenses. This caused severe financial losses, which Plaintiffs were unable to recoup even after they were permitted to re-open with limitations.

3. To protect their business from catastrophic situations like this one, the Restaurants purchased insurance from Defendant that included coverage for business interruption. The Restaurants' policies expressly provide coverage for "Lost Income" and the consequences of actions by "Civil Authority." Accordingly, the restaurants reasonably expected that their policies would help protect their businesses in the event that the government ordered them to stop or severely restrict operations in connection with a pandemic or any other Covered Cause of Loss.

4. Notwithstanding, and contrary to, the coverage provisions in their policies with Defendant, and the obligations Defendant undertook in exchange for the Restaurants' insurance premium payments, when Plaintiffs submitted claims with Defendant for coverage, Defendant summarily denied the Restaurants' claims. These denials were part of a premeditated strategy by Defendant to deny all claims related to the "shelter in place" orders and COVID-19. They were untethered to the facts of the claims, which Defendant did not adequately investigate, or the specific coverage provided by the Restaurants' policies, and were therefore illegal.

5. The other members of the proposed Class (defined below) were subject to the same conduct by Defendant. As a result of Defendant's conduct alleged herein, the Restaurants and other Class members suffered damages and, absent appropriate injunctive and declaratory relief, will continued to be harmed by Defendant's misconduct.

2001514.2

## II.    PARTIES

### A.    Representative Plaintiffs

6.    Plaintiff Pleasant Food, Inc. is a Tennessee Corporation that does business as Sidelines Grill Pleasant View.

7.    Plaintiff C & G, Inc. is a Tennessee Corporation that does business as Sidelines Grill Ashland City.

8.    Plaintiff Plantation Pub, Inc. is a Tennessee Corporation.

9.    Annex Road Group, Inc. is a Tennessee Corporation that does business as Hillwood Pub.

10.    DTAG, Inc. is a Tennessee Corporation that does business as Crow's Nest.

11.    JDA Pub, Inc. is a Tennessee Corporation that does business as Joe's Place.

### B.    Defendant

12.    Defendant Erie Insurance Exchange is a Pennsylvania corporation with its headquarters and principal place of business in Erie, Pennsylvania.

13.    Defendant utilizes Erie Insurance Group as a fictitious name.

14.    Defendant is registered to sell insurance in Tennessee with the Tennessee Department of Commerce and Insurance.

15.    Defendant sells insurance in Tennessee.

16.    Defendant maintains two or more physical offices in Tennessee.[1]

17.    Employees at Defendant's offices in Tennessee sell or help sell insurance in Tennessee.

---

[1] https://www.erieinsurance.com/contact-erie/locations/tennessee;
https://www.erieinsurance.com/contact-erie/~/link.aspx?_id=780AD866693D4C5AA6EBA4D895ADF5F9&_z=z.

2001514.2

18.     Substantial correspondence by Defendant with Plaintiffs concerning their insurance policies, and coverage at issue here, was signed by Defendant's employees in Tennessee. *See* Ex. 1–5.

19.     Defendant utilizes more than a hundred insurance agencies in Tennessee in furtherance of its insurance business.[2]

20.     Defendant advertises these agents as "Erie Insurance agent[s]." [3]

21.     Defendant represents that these agents sell Erie insurance.

## III.    JURISDICTION AND VENUE

22.     This Court has original jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because (a) at least one member of the proposed Class is a citizen of a state different from that of Defendant, (b) the amount in controversy exceeds $5,000,000, exclusive of interest and costs, (c) the proposed Class consists of more than 100 class members, and (d) none of the exceptions under 28 U.S.C. § 1332(d) apply to this action.

23.     This Court has personal jurisdiction over Defendant because Defendant is registered to do business in Tennessee, has sufficient minimum contacts in Tennessee, and otherwise intentionally avails itself of the markets within Tennessee through its business activities, such that the exercise of jurisdiction by this Court is proper.  Moreover, the claims of Plaintiffs in this case arise out of and directly relate to Defendant's contacts with Tennessee.

24.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District. Defendant has marketed, advertised, sold, and maintained insurance policies, and otherwise conducted extensive business, within this District.

---

[2] https://www.erieinsurance.com/agencies/tn

[3] *Id.*; https://www.erieinsurance.com/find-an-insurance-agent.

2001514.2

## IV. FACTUAL BACKGROUND

### A. The Rapid Spread of Coronavirus

25.     COVID-19 is an infectious disease caused by a recently discovered novel coronavirus known as SARS-CoV-2 ("Coronavirus" or "COVID-19").  The first instances of the disease spreading to humans were diagnosed in or around December 2019.

26.     According to the World Health Organization ("WHO"): "People can catch COVID19 from others who have the virus.  The disease can spread from person to person through small droplets from the nose or mouth which are spread when a person with COVID-19 coughs or exhales.  These droplets land on objects and surfaces around the person.  Other people then catch COVID-19 by touching these objects or surfaces, then touching their eyes, nose or mouth.  People can also catch COVID-19 if they breathe in droplets from a person with COVID-19 who coughs out or exhales droplets."[4]

27.     This is problematic, *inter alia*, because a human sneeze can expel droplets of mucus and saliva that travel at nearly a hundred miles an hour and can spread up to 27 feet.[5]

28.     According to a recent report in the New York Times, "[a]n infected person talking for five minutes in a poorly ventilated space can also produce as many viral droplets as one infectious cough."[6]  The more people in a conversation, the more droplets are dispersed.

---

[4] *See* Q&A on coronaviruses (COVID-19), "How does COVID-19 spread?," World Health Organization (April 16, 2020), *available at* https://www.who.int/news-room/q-a-detail/q-a-coronaviruses (last visited April 21, 2020).

[5] Sarah Gibbens, "See how a sneeze can launch germs much farther than 6 feet," *National Geographic* (April 17, 2020), *available at* www.nationalgeographic.com/science/2020/04/coronavirus-covid-sneeze-fluid-dynamics-in-photos/ (last visited April 20, 2020).

[6] *See* Yuliya Pashina-Kottas, et al., "This 3-D Simulation Shows Why Social Distancing Is So Important, *The New York Times* (April 21, 2020), *available at* https://www.nytimes.com/interactive/2020/04/14/science/coronavirus-transmission-cough-6-feet-ar-ul.html (last visited April 21, 2020).

2001514.2

29.     Although these droplets are smaller and less visible than rust, mold, or paint, they are physical objects which can travel to other objects and cause harm.

30.     These droplets can spread Coronavirus when they reach humans directly, or when they land on habitable surfaces where they can survive until that surface is touched by a potential human host.[7]

31.     Droplets containing Coronavirus infect a variety of surfaces and objects for a period of hours, days, or weeks, if not longer.  After inspecting a cruise ship inhabited by passengers carrying the Coronavirus, the CDC reported that Coronavirus was detectable on various surfaces inside the cruise ship up to 17 days after passengers had vacated the cabins.[8]

32.     Recent scientific evidence shows that Coronavirus can survive and remain virulent on stainless steel and plastic for three to six days; on glass and banknotes for three days; and on wood and cloth for 24 hours.[9]

33.     Testing involving similar viruses in the Coronavirus family shows that Coronavirus can likely survive on ceramics, silicon rubber, or paper for up to five days if not longer.[10]

---

[7] *See*, *e.g.*, CDC website, "How COVID-19 Spreads*,*" 2020, *available at* https://www.cdc.gov /coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last visited April 21 2020).

[8] *See* Leah E. Moriary, et al., "Public Health Responses to COVID-19 Outbreaks on Cruise Ships — Worldwide, February–March 2020," 69 *Morbidity and Mortality Weekly Report* 347 (March 23, 2020), *available at* https://www.cdc.gov/mmwr/volumes/69/wr/pdfs/mm6912e3-H.pdf (last visited April 21, 2020).

[9] *See* Neeltje van Doremalen, et al., "Aerosol and Surface Stability of SARS-CoV-2 as Compared to SARS-CoV-1," New England Journal of Medicine (Mar. 17, 2020), *available at* https://www.nejm.org/doi/pdf/10.1056/NEJMc2004973 (last visited April 21, 2020); Alex W.H. Chin, et al., "Stability of SARS-CoV-2 in different environmental conditions," The Lancet Microbe (April 2, 2020), available at https://doi.org/10.1016/S2666-5247(20)30003-3 (last visited April 21, 2020).

[10] *See* Guenter Kampf, et al., "Persistence of coronaviruses on inanimate surfaces and their

*Footnote continued on next page*

2001514.2

34.     When public areas containing such surfaces may have been exposed to Coronavirus, a number of countries including China, Italy, France, and Spain have required such areas to be fumigated prior to re-opening.[11]

35.     This Coronavirus has spread throughout Tennessee and the United States.

**B.     <u>Governments Around the Country Order Everyone to Shelter in Place</u>**

36.     As the virus spread in Tennessee, state and local officials began discussing wide scale business closures.

37.     On March 13, 2020 President Trump declared the COVID-19 outbreak a national emergency.

38.     On March 16, 2020, the Centers for Disease Control and Prevention, and members of the national Coronavirus Task Force issued to the American public guidance, styled as "30 Days to Slow the Spread" concerning measures to slow the spread of COVID-19. This guidance advocated for far-reaching social distancing measures, such as working from home,

---

*Footnote continued from previous page*

inactivation with biocidal agents," 104 Journal of Hospital Infection 246 (Feb. 6, 2020), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7132493/pdf/main.pdf (last visited Apr. 21, 2020).

[11] *See* Mike Bird, et al., "China Is Open for Business, but the Postcoronavirus Reboot Looks Slow and Rocky," *The Wall Street Journal* (March 26, 2020), *available at* www.wsj.com/articles/china-is-open-for-business-but-the-post-coronavirus-reboot-looks-slow-and-rocky-11585232600 (last visited April 22, 2020); Jason Horowitz, "In Italy, Going Back to Work May Depend on Having the Right Antibodies," *The New York Times* (April 4, 2020), *available at* www.nytimes.com/2020/04/04/world/europe/italy-coronavirus-antibodies.html (last visited April 22, 2020); Sarah Elzas, "French Teachers Push Back against Reopening Schools in May," *RFI* (released online Apr. 14, 2020), *available at* www.rfi.fr/en/france/20200414-french-teachers-push-back-against-reopening-schools-in-may (last visited April 22, 2020); Claudia Nuñez, "On the Front Line of the Coronavirus Threat in Spain, Tractors Scatter the Streets with Hope," *Los Angeles Times* (March 27, 2020), *available at* www.latimes.com/world-nation/story/2020-03-27/on-the-front-line-of-the-pandemic-tractors-scatter-the-streets-with-hope (last visited April 22, 2020).

2001514.2

avoiding shopping trips and gatherings of more than 10 people, and staying away from bars, restaurants, and food courts.

39. On March 22, 2020, citing President Trump's declaration, CDC guidance, and a pattern of similar statewide and local orders, Governor Lee issued executive order 17 requiring that "Restaurants, bars, and similar food or drink establishments, including nightclubs, shall not be open to persons, except only to offer drive-through, pickup, carry-out, or delivery service for food or drink." Ex. 6 at 3.

40. On March 28, 2020 the United States Department of Homeland Security issued a memorandum concerning the "Identification of Essential Critical Infrastructure Workers During Covid-19 Response."[12] This memorandum provided guidance for the implementation and standardization of all state shelter in place orders and the restrictions they place on different essential and non-essential businesses.

41. Following this advice, and recognizing that there had been numerous confirmed cases of COVID-19 in their jurisdictions, many state and local government administrations across the nation recognized the need to take steps to protect their residents from the spread of COVID-19. As a result, many governmental administrations entered civil authority orders interrupting or severely curtailing business operations of non-essential businesses that interact with the public and provide gathering places for the individuals.

42. As reflected, for example, by an April 10, 2020 proclamation by the City and County of San Francisco, these civil authority orders have been issued "because of the propensity of the virus to spread person to person and also because the virus physically is causing property loss or damage due to its proclivity to attach to surfaces for prolonged periods

---

[12] https://www.cisa.gov/sites/default/files/publications/Version_3.0_CISA_Guidance_on_Essential_Critical_Infrastructure_Workers_1.pdf

2001514.2

of time." Ex. 7 at 2. *See also* Ex. 8 and 9 (reflecting similar findings in New York City and Los Angeles).

43.     For its part, on March 15 and 20, 2020 the Metropolitan Government of Nashville and Davidson County Health Department issued orders summarized by Amended and Restated Order 1 which prohibited restaurants, bars, and similar businesses in its jurisdiction from serving food and drink on the premises. These restrictions were later modified on May 22, 2020, retaining limitations on access and use.

44.     On March 30, 2020, Governor Lee issued Executive Order 21 requiring the closure of all entertainment and recreational gathering facilities, including night clubs and concert venues. Ex. 10 at 2.

45.     Executive orders 17 and 21 were subsequently extended by Executive Order 27, dated April 13, 2020, through April 30, 2020.

46.     On April 28, 2020, Governor Lee issued Executive Order 30 extending the closure of recreational facilities and modifying the restrictions on access to and the use of restaurants, bars, night clubs, and live performance venues for purpose of providing certain food service, retaining limitations on access and use. Ex. 11 at 6–7.

47.     On May 22, 2020 Governor Lee issued Executive Order 38 modifying the restrictions on access to and the use of bars, night clubs, and limited service restaurants for purposes of provided limited table service of beverages, retaining limitations on access and use. Ex. 12 at 7-8.

48.     Collectively, the above-referenced orders of the State of Tennessee and relevant local authorities are referred to herein as the "Orders."

2001514.2

49.     Statewide efforts similar to Tennessee's have been implemented around the country in responses to thousands if not hundreds of thousands of confirmed inflections.  State governments have required large scale business closures and imposed other limitations on customer and employee movement that prevent restaurants from operating and/or force them to suffer losses.

50.     For example, on March 16, 2020, New York Governor Andrew Cuomo, in conjunction with New Jersey Governor Phil Murphy and Connecticut Governor Ned Lamont ordered the closure of all gyms, movie theaters, bars and casinos.  Ex. 13–15. [13]  Restaurants were also ordered to close except for the fulfillment of take-out and delivery orders.  *Id.*

51.     In all, 49 state governments have enacted at least one civil authority order prohibiting or severely limiting dine in service and other operations at restaurants.[14]  South Dakota is the only state whose government may not yet have enacted such an order at the state level.

52.     The Orders were issued due to direct physical loss of and/or direct physical damage to properties.  In each jurisdiction, there were numerous individuals who tested positive for COVID-19, and the number of positive tests continues to grow.  Further, COVID-19 was and is present in these areas because, for example, it has attached to properties and surfaces on, at, or within properties; and because COVID-19 was and is being transmitted in or between properties throughout these areas, including but not limited to transmission through the air, through

---

[13] These orders were subsequently extended until May 15, 2020 by Governors Cuomo (NY), Murphy (NJ), and Lamont (CT).  *See* Caitlin Oprysko, Politico (April 16, 2020), "More than a dozen states have extended stay-home orders past White House deadline," https://www.politico.com/news/2020/04/16/coronavirus-stay-home-orders-extended-190889 (last accessed May 5, 2020).

[14] https://www.kff.org/health-costs/issue-brief/state-data-and-policy-actions-to-address-coronavirus/ (last accessed May 3, 2020)

ventilation systems, or through contact with contaminated surfaces. The presence of COVID-19 resulted in and continues to result in direct physical loss, including but not limited to loss of use of properties, as well as direct physical damage to properties. The Orders were issued by governmental entities due to these types of direct physical loss of, and/or direct physical damage to, properties within their respective jurisdictions.

        **C.**      **The Restaurants Close**

53.      All of the Restaurants have serving areas which are spaces where patrons may receive and consume food and drink on the premises of the Restaurants. This includes (but is not limited to) dining rooms, dining areas, drinking areas, lounges, patios, outdoor service areas, seating around bars or drink service areas.

54.      Under the Orders, the Restaurants were forced to close their serving areas to the public, thereby prohibiting access to, use of, and operations at the Restaurants.

55.      Under the Orders, the Restaurants were forced to suspend dine in food and/or drink offerings at the Restaurants and service of dine in food and/or drink to customers, thereby prohibiting access to, use of, and operations at the Restaurants.

56.      Under the Orders, customers were prohibited from accessing and using the Restaurants' serving areas, thereby prohibiting access to, use of, and operations at the Restaurants.

57.      Under the Orders, customers were prohibited by social distancing guidelines from accessing and utilizing the Restaurants' serving areas, thereby prohibiting access to, use of, and operations at the Restaurants.

58.      Under the Orders, the Restaurants' employees were prohibited from traveling to or accessing the Restaurant for purposes of preparing and serving dine in food and/or drink, thereby prohibiting access to, use of, and operations at the Restaurants.

59.     Under the Orders, the Restaurants' employees were prohibited from traveling to or accessing portions of the Restaurant utilized exclusively for preparing and serving dine in food and/or drink, thereby prohibiting access to, use of, and operations at the Restaurants.

60.     Under the Orders, the Restaurants' employees were prohibited from working in close proximity to each other, thereby prohibiting access to, use of, and operations at the Restaurants.  This includes, but is not limited to, social distancing requirements and other safety requirements that are not compatible with professional use of a kitchen and/or drink preparation areas.   Under the Orders, both Restaurants lost access to portions of the Restaurants (and property therein), lost use of the Restaurants (and property therein), lost necessary use of necessary facilities at the Restaurants (and property therein), and interrupted operations at the Restaurants.

61.     As a result, the Restaurants were rendered untenantable and suffered and continue to suffer substantial lost business income and other financial losses.

62.     These extraordinary losses of business income (and concern for their employees' welfare) are precisely why the Restaurants took out insurance policies with Defendant that included business interruption coverage, which were meant to cover these losses.

### D.     The Losses From These Closures Are Covered Business Interruptions

63.     The Restaurants purchased insurance policies from Defendant that included business interruption (and other related) insurance coverage.

64.     Plaintiff Pleasant Food, Inc. which does business as Sidelines Grill Pleasant View has an insurance policy with Defendants under policy number Q97-1245271.

65.     Plaintiff C & G, Inc. which does business as Sidelines Grill Ashland City has an insurance policy with Defendants under policy number Q97-0942058.

66.     Plaintiff Plantation Pub, Inc. has an insurance policy with Defendants under policy number Q97-1322853.

67.     Annex Road Group, Inc. which does business as Hillwood Pub has an insurance policy with Defendants under policy number Q97-1827835.

68.     DTAG, Inc. which does business as Crow's Nest has an insurance policy with Defendants under policy number Q97-1029938.

69.     JDA Pub, Inc. which does business as Joe's Place is also covered by insurance policy number Q97-1029938.

70.     Collectively the Restaurants insurance policies with Defendant, including (but not limited to) those listed above, shall be referred to as the "Policies."

71.     The Restaurants promptly and dutifully paid their premiums and complied with all other elements of the Policies and their agreements with Defendant.

72.     In many countries, property insurance is sold on a specific peril basis. Such policies only cover losses from causes that are expressly covered like an earthquake, fire, or terrorist attack.  Most property policies sold in the United States are all-risk property damage policies which cover losses from all causes that are not expressly excluded.

73.     The Policies are all-risk property damage policies because their terms indicate that they cover all risks which can cause harm to physical property except for risks that are expressly and specifically excluded.  In the Policies provided to Plaintiffs, Defendant indicated that they "insure[] against direct physical 'loss,' except 'loss' as excluded or limited in this policy." Ex. 16 at 15; Ex. 17 at 16.

74.     The Policies provide Income Protection Coverage which includes "loss of 'income' and/or 'rental income' [the policyholder] sustain[s] due to partial or total 'interruption

of business' resulting directly from 'loss' or damage to property on the premises." Ex. 16 at 14; Ex. 17 at 15.

75.     The Orders prohibited the physical access to, use of, and operations at and by the Restaurants, their employees, and their customers. This includes, among other things, loss of the ability to welcome customers onto the Restaurants' physical premises, offer the physical dining experience of eating or drinking on site, and use any of the physical property associated with these activities. As a result of the Orders, physical components of the Restaurants became unusable, damaged, and/or lost the ability to generate income.

76.     As a result of this physical loss or damage, it became the Restaurants interrupted operations, lost business income, incurred necessary expenses, and suffered other related covered losses (including but not limited to extended business income and extra expenses).

77.     The Restaurants' Policies also provide Civil Authority coverage, pursuant to which Defendant agreed that it "loss of 'income' and/or 'rental income'[the policyholder] sustain[s] and necessary 'extra expense' caused by action of civil authority that prohibits access to the premises." Ex. 16 at 15; Ex. 17 at 16.

78.     The Restaurants are located in and near Nashville.  As the Coronavirus spread, the streets on which the Restaurants are located, and the buildings and objects in and around them, became a breeding ground for the disease.

79.     The Orders were issued due to direct physical loss of and/or direct physical damage to properties.  There are numerous individuals who had tested positive for COVID-19, and those numbers continue to grow.  COVID-19 was and is present in these areas because, for example, it has attached to properties and surfaces on, at, or within properties near the Restaurants; and because COVID-19 was and is being transmitted in or between properties

2001514.2

throughout the areas near the Restaurants, including but not limited to transmission through the air, through ventilation systems, or through contact with contaminated surfaces. The presence of COVID-19 resulted in and continues to result in direct physical loss, including but not limited to loss of use of properties, as well as direct physical damage to properties, and this direct physical loss and/or direct physical damage prompted the issuance of the Orders. Underscoring this, prior to the issuance of the Orders, government authorities had been limiting access to other properties on the basis of the Coronavirus, including (but not limited to) sporting arenas, concert venues, and other places where large numbers of people may gather.

80.     The prohibitions and limitations imposed by the Orders prohibited access to, use of, and operations at and by the Restaurants, their employees, and their customers. As a result of the Orders, components of the Restaurants became unusable and/or lost the ability to generate income.

81.     As a result, the Restaurants lost business income, and suffered other related covered losses (including but not limited to extended business income and extra expenses).

82.     COVID-19 is a Covered Cause of Loss under the Policies.

83.     The Policies contain language and exclusions drafted by the Insurance Services Office ("ISO"). Ex. 16 at 94; Ex. 17 at 96.

84.     On information and belief, the form used for the Policy is also used by Defendant for numerous other insurance policies issued by Defendant to the Class members.

85.     The ISO is a company that drafts standard policy language for use in insurance contracts used by insurers around the country.

86.     In 2006, the ISO drafted a new endorsement, CP 01 40 07 06, acknowledging that claims for business interruption losses would be filed under existing policy language for losses

resulting from the presence of disease-causing agents. Endorsement CP 01 40 07 06, which other insurers have since incorporated in policies, provides that the insurer "will not pay for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease."

87. When preparing CP 01 40 07 06, ISO, circulated a statement to state insurance regulators that included the following acknowledgement:

> Disease-causing agents may render a product impure (change its quality or substance), or enable the spread of disease by their presence on interior building surfaces or the surfaces of personal property. When disease-causing viral or bacterial contamination occurs, potential claims involve the cost of replacement of property (for example, the milk), cost of decontamination (for example, interior building surfaces), and business interruption (time element) losses. Although building and personal property could arguably become contaminated (often temporarily) by such viruses and bacteria, the nature of the property itself would have a bearing on whether there is actual property damage. An allegation of property damage may be a point of disagreement in a particular case.

88. The insurance industry has thus recognized that the presence of virus or disease can constitute physical damage to property since at least 2006.

89. Defendant intentionally chose not to include CP 01 40 07 06 in the Policies and in its insurance policies issued to other Class members.

90. Defendant is aware of contractual force majeure clauses that suspend duties to perform in the event of a global pandemic.

91. Defendant chose not to use force majeure clauses in the Policies or in insurance policies issued to other Class members.

### E.     Defendant's Denial of Plaintiffs' Insurance Claim

92.     The Restaurants requested insurance coverage from Defendant. These claims were assigned identifying numbers including (but not necessarily limited to) A00002572121, A00002572113, A00002572096, A00002572072, and A00002572085.

93.     Defendant denied Plaintiffs' claims without any inspection or review of the Restaurants' physical locations or documents concerning their business activities in 2020.

94.     Defendant has thereby waived any right to inspect those premises, deny coverage for any reason related to conditions at those locations, or raise any defense related to conditions at those locations or facts specific to the Restaurants.

95.     The rapidity of Defendant's denial of Plaintiffs' claim, and their lack of consideration given to the specific details of the claim, indicate that Defendant could not have engaged in a good faith or reasonable investigation of the claims which included assessment of facts or issues relevant to the Restaurants.

96.     Defendant accepted the premiums paid by the Restaurants with no intention of providing lost business income, physical damage, civil authority, or other applicable coverage for claims like those submitted by Plaintiffs and the proposed Class members and which were denied by Defendant.

97.     Defendant's rejection of the Restaurants' claims was part of a policy by Defendant to limit its losses during this pandemic, notwithstanding that the Policies provide coverage for losses due to loss of functionality of property, loss of use of property, and from closure orders issued by civil authorities (among other coverage).

98.     Although industry trade groups have argued that insurance companies do not have the funds to pay claims related to the Coronavirus and will require government assistance, the reality is that insurers are simply trying to minimize their exposure.  "According to data from

ratings firm A.M. Best Co., the insurance industry as a whole has $18.4 billion in net reserves for future payouts.[15]

99.     Overall, Defendant itself has more than $20 billion in assets and collects at least tens of millions of dollars per year in property insurance premiums.[16]  Notwithstanding this, Defendant appears to be categorically denying claims brought by businesses ordered to close following the Coronavirus, including those brought by Plaintiffs and the proposed Class.  This deliberate strategy and common policy, and the insurance industry's public requests for government assistance, suggest strongly that their true goal is minimizing payments by any means necessary.

100.     Defendant's wrongful denials of the Plaintiffs' claims were not isolated incidents. Rather, on information and belief, Defendant has engaged in the same misconduct, alleged herein with respect to Plaintiffs, in connection with claims submitted by numerous of Defendant's insureds who have suffered losses related to the Coronavirus pandemic and submitted claims which were categorically denied.

101.     Plaintiffs' claims and those of the proposed Class all arise from a single course of conduct by Defendant: its systematic and blanket refusal to provide any coverage for business losses related to the COVID-19 pandemic and the related actions taken by civil authorities to interrupt business operations.

---

[15] Leslie Scism, "U.S. Businesses Gear Up for Legal Disputes With Insurers Over Coronavirus Claims," *Wall Street Journal* (March 6, 2020), *available at* https://www.wsj.com/articles/u-s-businesses-gear-up-for-legal-disputes-with-insurers-over-coronavirus-claims-11583465668?mod=article_inline (last accessed May 4, 2020).

[16] http://ratings.ambest.com/companyprofile.aspx?ambnum=4283&URatingId=-1&bl=64&AltSrc=3&PPP=&AltNum=15734283&Ext_User=152.138.7.4&Ext_Misc=Company Profile:&Portal=0

2001514.2

102.     Defendant's wrongful conduct alleged herein has caused significant damage and will continue to cause significant damage, to Plaintiffs and the other members of the proposed Class.

103.     Defendant's categorical treatment, failure to investigate in good faith, and denial of Plaintiffs' and the Class members' claims appears to be part of a broader strategy being employed by the insurance industry generally, to broadly deny claims for business interruption coverage related to the Coronavirus pandemic, as has been widely reported by the media and resulted in numerous lawsuits brought by businesses against property insurance companies throughout the country.

## V.    CLASS ACTION ALLEGATIONS

104.     Pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3), Plaintiffs bring their claims (as further indicated below) on behalf of themselves and a "Class" defined as:

**Class**

All persons or entities in the United States (including its territories and the District of Columbia) who own an interest in a business that served food or drink on the premises and was insured by Defendant in March 2020, made (or attempted to make) a claim with Defendant arising from loss of income (or extra expense or other losses related to business interruption) at that business related to COVID-19, and did not receive coverage for that claim.

105.     Excluded from the Class are Defendant and its subsidiaries and affiliates; all persons who make a timely election to be excluded from the Class; governmental entities; and the Judge to whom this case is assigned and his immediate family. Plaintiffs reserve the right to revise the Class definitions based upon information learned through discovery or as otherwise may be appropriate.

106.     Pursuant to Federal Rule of Civil Procedure 23(c)(4) and 23(c)(5), Plaintiffs seek to represent any issue class or subclasses as Plaintiffs may propose and/or the Court may designate at the time of class certification.

107.    **Numerosity: Rule 23(a)(1).** The Class is too numerous and dispersed for joinder of all Class members to be practicable.  On information and belief, the Class consists of at least hundreds, if not thousands, of persons and entities.  The precise number of Class members can be ascertained from Defendant's records.  Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, social media, and published notice.

108.    **Commonality: Rules 23(a)(2).** This action involves significant common questions of law and fact, including, but not limited to:

a.  Whether the insurance policies issued by Defendant to Plaintiffs and the Class are all-risk policies?

b.  Whether the actions of civil authorities taken in response to the presence or threat of COVID-19 interrupted businesses serving food or drink on the premises?

c.  Whether the actions of civil authorities taken in response to the presence or threat of COVID-19 prohibited access at businesses serving food or drink on the premises?

d.  Whether Defendant's Business Income coverage applies to an interruption  of business caused by COVID-19 and/or related actions of civil authorities taken in response to the presence or threat of COVID-19;

e.  Whether Defendant's Civil Authority coverage applies to a loss of business income caused by the orders of local, municipal, city, county, and/or state or national governmental entities requiring the interruption of business during the outbreak of COVID-19 in the United States;

f.   Whether blanket denials of all claims for business losses related to COVID-19 and/or the related actions of civil authorities taken in response to the presence or threat of COVID-19 breach Defendant's insurance contracts?

g.   Whether blanket denials of all claims for business losses related to COVID-19 and/or the related actions of civil authorities taken in response to the presence or threat of COVID-19 are an unfair business practice?

h.   Whether blanket denials of all claims for business losses related to COVID-19 and/or the related actions of civil authorities taken in response to the presence or threat of COVID-19 are a deceptive fraudulent business practice?

i.   Whether blanket denials of all claims for business losses related to COVID-19 and/or the related actions of civil authorities taken in response to the presence or threat of COVID-19 are an unlawful business practice?

j.   Whether Plaintiffs and the Class members are entitled to a declaratory judgment as to the meaning of their policies?

109.   ***Typicality: Rule 23(a)(3).*** Plaintiffs' claims are typical of the claims of the Class members whom they seek to represent.  Plaintiffs and all Class members purchased insurance coverage from Defendant that included coverage for business interruption and all had claims denied pursuant to Defendant's misconduct alleged herein.  Plaintiffs' claims are based upon the same legal theories as the claims of the other Class members.

110.   ***Adequacy: Rule 23(a)(4).*** Plaintiffs will fairly and adequately represent and protect the interests of the Class members. Plaintiffs have retained counsel competent and experienced in complex class action litigation, including insurance coverage and other consumer

protection litigation. Plaintiffs intend to prosecute this action vigorously. Neither Plaintiffs nor their counsel have interests that conflict with the interests of the other Class members.

111.    *Rule 23(b)(2).* Defendant has acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Class, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class as a whole.

112.    *Rule 23(b)(3).* Common questions of law and fact will predominate over any questions, if any, affecting only individual class members, and a class action is the superior method for fair and efficient adjudication of the controversy.  The damages or other financial detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for members of the Class to individually seek redress for Defendant's wrongful conduct.

113.    Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

## VI.    <u>CAUSES OF ACTION</u>

**FIRST CAUSE OF ACTION**
**Breach of Contract**

**(On Behalf of Plaintiffs and the Class)**

114.    Plaintiffs re-allege and incorporate by reference into this cause of action all allegations set forth in paragraphs 1–113 of this Complaint.

115.    Plaintiffs bring this cause of action on behalf of themselves and the proposed Class.

116.     At all times relevant herein, Plaintiffs and the Class have paid all premiums and fulfilled or performed all obligations they have to Defendant, including those under all relevant insurance policies described in this complaint.

117.     Defendant had contractual duties to provide Plaintiffs and the Class with insurance coverage, as alleged herein.

118.     By its conduct alleged herein, including denying Plaintiffs' and the Class members' insurance claims and refusing to perform under the contract, Defendant breached those duties.

119.     As a result of Defendant's breaches, Plaintiffs and the Class have been damaged in the amount of coverage to which they are entitled their insurance agreements, the premiums they paid, and in an amount to be proved at trial.  Plaintiffs seek compensatory damages with interest thereon for themselves and the Class members.

120.     Plaintiffs attempted to mitigate their loss of income but were unable to. Prior to the closures, Plaintiffs did not provide delivery service or meaningful takeout service. In an effort to mitigate their lost income, several Plaintiffs offered takeout service beginning in middle and later April, 2020. These efforts have produced extremely modest amounts of income which are not remotely comparable to 2019 income during the same period and are insufficient to meet mounting expenses. All Restaurants have re-opened with limitations under the orders and continue to earn fractions of prior income.

**SECOND CAUSE OF ACTION**
**Breach of Covenant of Good Faith and Fair Dealing**

**(On Behalf of Plaintiffs and the Class)**

121.     Plaintiffs re-allege and incorporate by reference into this cause of action all allegations set forth in paragraphs 1–113 of this Complaint.

122.     Plaintiffs bring this cause of action on behalf of themselves and the proposed Class.

123.     When Defendant entered its agreements with Plaintiffs and the Class, and with an successive amendments thereto, Defendant undertook and were bound to covenants implied by law that they would deal fairly and in good faith with Plaintiffs and the Class, and not engage in any acts, conduct, or omissions that would diminish the rights and benefits due Plaintiffs and the Class or defeat the reasonable expectations of Plaintiffs and the Class under the their agreements with Defendant.

124.     By its conduct alleged herein, Defendant breached the implied covenant of good faith and fair dealing arising out of its agreements with Plaintiffs and the Class including but not limited to by: (a) unreasonably and in bad faith denying Plaintiffs and the Class members insurance coverage to which they are entitled; (b) failing and refusing to perform a fair, objective, good faith, and thorough investigation of the claim; (c) asserting coverage defenses that were legally and/or factually invalid and thereby delaying resolution of Plaintiffs' and the Class members' claims; and (d) placing unduly restrictive interpretations on the terms of its insurance policies for the purpose of denying coverage due.

125.     In committing its breaches, Defendant has acted with malice, shown a reckless and outrageous indifference to a highly unreasonable risk of harm, and acted with a conscious indifference to Plaintiff's and the Class members' rights and welfare, thereby entitling Plaintiffs and the Class members to punitive and exemplary damages against the Defendant. As a direct and proximate result of the above-referenced breach, Plaintiffs have had to retain attorneys to enforce their rights, and those of the proposed Class, to the insurance coverage to which they are entitled and have thereby been injured and damaged.

2001514.2

126.    Plaintiffs, therefore, are entitled to recover and seek in connection with this Cause of Action, for themselves and the Class: (a) an award of general damages and other monetary damages, including all foreseeable consequential and incidental damages for diminution in value, loss of use, and other incidental damages and out-of-pocket expenses, plus interest, in an amount to be determined at trial; (b) punitive and exemplary damages in an amount to be determined at trial; (c) costs of suit; and (d) reasonable attorney's fees in connection with this action.

### THIRD CAUSE OF ACTION
### Declaratory Relief

**(On Behalf of Plaintiffs and the Class)**

127.    Plaintiffs re-allege and incorporate by reference into this cause of action all allegations set forth in paragraphs 1–113 of this Complaint.

128.    Plaintiffs bring this cause of action on behalf of themselves and the proposed Class.

129.    The Court may declare rights, duties, statuses, and other legal relations, regardless of whether further relief is or could be claimed.

130.    An actual controversy has arisen between Plaintiffs and the Class and Defendant as to their respective rights and duties under Plaintiffs' and the Class members' insurance policies.

131.    Resolution of the parties' respective rights and duties under Plaintiffs' and the Class members' insurance policies by declaration of the Court is necessary, as there exists no adequate remedy at law.

132.    Plaintiffs allege and contend, with respect to Plaintiffs' and the Class members' Civil Authority coverage, that the above-described orders trigger that coverage because (a) they are orders of a civil authority, (b) the orders specifically prohibit access to the premises in question, including prohibiting potential on-premises customers and workers from accessing the

2001514.2

premises in question, (c) such access prohibition has been continuous and ongoing since the orders were issued, such that the prohibited access has not subsequently been permitted, (d) the orders prohibit access as the direct result of direct physical loss of or damage to property, other than at the premises in question, caused by or resulting from a Covered Cause of Loss (e) no coverage exclusions or limitations apply to exclude or limit coverage, (f) Plaintiffs and the Class have suffered actual and covered loss of Business Income in an amount to be determined at trial, and (g) coverage should begin as of dates to be determined at trial.

133.    Plaintiffs allege and contend that Plaintiffs' and the Class members' Lost Business Income Coverage is triggered because (a) Plaintiffs and the Class members have sustained actual loss of Business Income due to the closure of their businesses, (b) said closure constitutes a necessary interruption of their operations under their insurance policies, (c) this interruption has been and is caused by direct physical loss of or physical damage to property at the premises in question, including personal property in the open (or in a vehicle) within 1,000 feet of the premises in question, due to the presence of Coronavirus, (d) the presence of Coronavirus is a Covered Cause of Loss, and (e) some or all of the periods of the Plaintiffs' and Class members' closures are within the period of restoration under their insurance policies.

134.    Plaintiffs allege and contend that Defendant wrongly denied coverage with respect to all the foregoing provisions, as to Plaintiffs and the Class.

135.    Upon information and belief, Plaintiffs allege that Defendant dispute and deny each of Plaintiffs' contentions set forth in this Cause of Action.

136.    Plaintiffs, therefore, seek a declaratory judgment, on behalf of themselves and the Class, regarding each of the contentions set forth in this Cause of Action. A declaratory judgment determining that Plaintiffs and the Class are due coverage under their insurance

2001514.2

policies, as set forth above, will help to ensure the survival of these businesses during this prolonged closure made necessary by the orders and by the presence of Coronavirus around the businesses during this global pandemic.

## VII.    <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, pray for judgment in their favor and against Defendant, as follows:

a.    For a declaration adopting each of Plaintiffs' contentions set forth in the above Cause of Action for Declaratory Relief;

b.    For injunctive relief enjoining and restraining Defendant's unlawful and/or deceptive conduct as alleged herein, including but not limited to its wrongful denials of coverage under Plaintiffs' and the Class' insurance policies;

c.    For specific performance of the insurance policies;

d.    For general and compensatory damages, restitution, and disgorgement, in an amount to be determined at trial;

e.    For exemplary and punitive damages in an amount to be determined at trial;

f.    For  costs of suit;

g.    For reasonable attorney's fees incurred in this action pursuant to statute, or as otherwise recoverable;

h.    For pre judgment and post-judgment interest; and

i.    For such other relief as the Court may deem proper.

## VIII.    <u>JURY TRIAL DEMAND</u>

Plaintiffs demand a trial by jury.

2001514.2

Dated:  July 1, 2020

_Mark P. Chalos_

Mark P. Chalos (State Bar No. 19328)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
222 2nd Avenue South, Suite 1640
Nashville, TN  37201-2379
Telephone:  615.313.9000
Facsimile:  615.313.9965

Robert J. Nelson (to be admitted _pro hac vice_)
Fabrice N. Vincent (to be admitted _pro hac vice_)
Jacob H. Polin (to be admitted _pro hac vice_)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:  415.956.1000
Facsimile:  415.956.1008

Jim Higgins (State Bar No. 16142)
THE HIGGINS FIRM
525 4th Ave S
Nashville, TN 37210
Telephone:  615.353.0930
Facsimile:  888.210.5883

Alexandra L. Foote (to be admitted _pro hac vice_)
LAW OFFICE OF ALEXANDRA L. FOOTE, P.C.
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:  786.408.8083
Facsimile:  415.956.0561

_Attorneys for Plaintiffs_
C & G, Inc. dba Sidelines Grill Ashland City
Pleasant Food, Inc. dba Sidelines Grill Pleasant View
Plantation Pub, Inc.
Annex Road Group, Inc. dba Hillwood Pub
DTAG, Inc. dba Crow's Nest
JDA Pub, Inc. dba Joe's Place

2001514.2